distinguished jurist from the District Court who has agreed to sit with us for at least two days, I think out of fear that we might scuttle off even more if he leaves us to our own devices, but it's a real honor. It's been I think 10 years since we sat together, so it's a real honor to have you back. Thank you, thank you Judge McKee for your incredibly generous and frivolous introduction. Also, if the attorneys are here in the second case, Freeman v. Corzine, I just saw late last night, I don't know how this happened, but the time allotment on these minutes are disastrously wrong. According to this, the appellant cross appellee has 10 minutes and the attorneys for the appellee's cross appellants have 25 minutes. You'll get the same amount of time. We can either do it by knocking down the appellee cross appellants to 10 minutes, which my guess is you would not favor, or we can give everybody 25 minutes. And we're not going to religiously run by the clock anyhow, but anybody will have the same amount of time. One side has 25 minutes, the other side will have 25 minutes, so as you think there, you can prepare your remarks accordingly. I don't know how that happened, but applause on his part. How does it look? Judge, that happens by way of a joint stipulation. Oh, you're agreeing to take less time. Excellent. It correlates to the alignment of the parties, but not exactly as it shows. Okay. The only thing I'd add to that is on the minutes, it has the merits preceding the standing, which doesn't make a lot of sense. Whoever's handling the standing ought to address this first, and then we can get to the person handling the merits after that, unless you stipulated that you don't want to do it that way. Okay. Okay. Thanks. All right. First matter, Kelly v. Burrill of Carlisle Council. Ms. Winkleman, it's a pleasure to see you. I don't think I've ever had the pleasure of having you, except for an en banc. I don't think I've ever had the pleasure of having you argue. Let me know how we do when this is over. May it please the Court? My name is Dennis Foyle, and I represent the appellant, Brian Kelly. I would respectfully request to reserve two minutes for rebuttal. All right. Your Honors, Ms. Winkleman and I will be dividing this argument in the following manner. I will be addressing the constitutional violations in this case, as well as the issue of qualified immunity. Ms. Winkleman will be addressing post-Pearson sequencing of the decision of constitutional arguments, as well as the First Amendment violation itself. Okay. On May 24, 2007... We know the facts. Why don't you just let us know how you view the district court's application of the law to the record that we have? Your Honor, I think the district court erred in several significant ways. First of all, I don't think the district court ever addressed the constitutional violations in this case properly, both the Fourth and First Amendment violations. What is your belief in terms of the First Amendment? Is it a right to gather information? Is it a right of freedom of expression? It's kind of a strange situation. What do you rest your First Amendment claim on? We believe that the right to expressive conduct includes the right to gather information, and that that's what was occurring in this case, that Brian Kelly had actually turned on his video camera to record a police officer who was actually in the performance of his duty in a public location where there was no expectation of privacy. Essentially, what Mr. Kelly wanted to do was document the behavior of the police officer, whom he thought was being rude and loud, and we believe that the First Amendment would include that sort of gathering of information so that it can be documented to be shown later. Well, why does the First Amendment include a gathering of information that's distinct from an expression of ideas? Well, there are court cases, Your Honor, as I'm sure Your Honor is aware, that says the Fourth Amendment includes the right to receive information, and I'm thinking of the Stanley v. Georgia line of cases from the Supreme Court. Certainly, the right to receive information should include the right to document that information as it has been received. What about a reasonable restriction on the way the information is documented? Well, I believe there could be a reasonable restriction on the way it's documented. In this particular case, however, this was an incident that occurred in broad daylight on a public street involving a public official in performance of his public duties. So where that right ends, I can't really say for sure, but it certainly includes under any circumstance the right to record a police officer performing his public duties on a public street where there's no expectation of privacy. You're mixing the First and Fourth Amendment there. Pardon? You're mixing the First and Fourth Amendment there. You said the right to gather information extends to a public street where there's no expectation of privacy. I think that's – and I understand that I'm mixing the two concepts. However, if there is no expectation of privacy, that is a Fourth Amendment concept, and I understand that. But it also shows that restrictions on the First Amendment should be less stringent under those circumstances. The Ninth Circuit has recognized the constitutional right to videotape specifically. The Eastern District Court has recognized the constitutional right to videotape in the Robinson v. Federer case back in 2005. That was a very different situation though, wasn't it? There was an allegation or a belief on the part of one citizen that police were engaged in misconduct, and as a result of the citizen's action, charges were brought. It does seem to me that this is more of a casual encounter than you had in Robinson. Robinson was not a casual encounter. He was intentionally seeking out to document what the photographer believed was evidence of wrongdoing. And in this particular case, if you look at Brian Kelly's deposition in the record, as we cited in our brief, he believed that the police officer was likewise engaged in unprofessional conduct, and that was why he turned on the video camera was so he could document that. So I believe that the essence of this case is identical to the Robinson case, actually. When police effectuate a traffic stop, do they have a right to order the passengers to put their hands on the dashboard? I believe that they do, Your Honor. Do they have a right to order the passengers to get out of the vehicle? As part of a routine investigatory traffic stop, I believe that they do. Well, if you answer both of those questions correctly, how do we reconcile the police's right to do that with your client's alleged right to be sitting there videotaping them? Well, I think there's actually two different circumstances. In this case, Brian Kelly was not asked to leave the car. He was not asked to put his hands on the dashboard. But he could have been. He could have been. He could have been ordering out of the car, and under, I think it's MIMS, he could have been spread eagles on the ground. He could have been, yes. He could have been. However, if that's not happening, there's a right by any bystander, whether he's in the car or not in the car. So the First Amendment right is dependent upon what instructions the officer gives your client? No, I don't believe it is, Your Honor. I believe there would be a First Amendment right of a passenger in a car to record the traffic stop. That right may be limited. But how can he do that if his hands are on the dashboard or if he's out of the vehicle with his hands on the trunk? How can he record? Perhaps he could turn the camera on before those events happened. And that would perhaps be a way to restrict the First Amendment right. However, in this particular case, you know, he was not asked to do anything except turn off his video camera and turn it over to the police. Isn't that a more minor intrusion upon him than having him be ordered out of the vehicle? I think it's a more significant intrusion of his First Amendment rights. And if he had been ordered out of the vehicle? Of the First Amendment rights, yes, I think it would be more significant. Well, how would he exercise his First Amendment rights if he's outside the vehicle with his hands on the trunk? How does he videotape him? I apologize, Your Honor. As I understand, Mims, in those cases, the concern was officer safety and the ability to conduct a routine investigatory traffic stop to determine that there were no safety issues or other issues related to the police officers. In this case, the officers never mentioned any sort of safety concerns or anything of that nature. Certainly, if Brian Kelly had been outside the vehicle standing on the street, there would be no authority to have him put his hands on the dashboard or lie straight on the ground. Brian Kelly, in this case, was an independent, a third-party observer of the arrest, just as the bystander was or the person recording the incident in Robinson was. You just anticipated my concern, which is, are traffic stops qualitatively different than public street cases? Isn't there a history of danger to officers in traffic stops that one wouldn't find in the case that Judge Barnell decided or other cases involving public parks or public streets, places like that? I don't know that traffic stops are qualitatively different. There's a whole line of screen. I understand the whole line of screen. And I understand that, Your Honor. But those cases don't deal with restriction of videotaping of what's going on. Well, back in the days of Carroll, there was no such thing as videotaping. I apologize. Back in the days of Carroll, there was no such thing as videotaping. That's correct. There wasn't. But what videotaping does is videotaping actually protects both the officers and the occupants of the car from any allegations of misconduct by either side. Is that what you understand Mr. Kelly was interested in doing, protecting Officer Rogers? I think Brian Kelly was interested in documenting exactly what had happened at that particular time. He believed that he was observing officer misconduct just like the person doing the videotaping in the Robinson case. He thought it was important that this conduct be recorded so that everybody would know that. Would he have been authorized, do you think, under the First Amendment to, as he was being placed under arrest, stand up and yell and summon all of those around to be aware of what was going on, this outrageous activity? I think he could have indicated that outrageous activity was going on during the course of his arrest, yes. If he does it in a quiet voice. If he does it in a way that doesn't violate the law. Perhaps that's not fair. But if he's not being argumentative or tumultuous or... Why couldn't he be argumentative? Isn't that what the First Amendment's all about? I would agree with that. In this case, though, he was not being argumentative. He was just attempting to record exactly what happened. I appear to be out of time. I didn't get to get to my other two arguments. Which were your other two arguments? The Fourth Amendment? The Fourth Amendment. We believe that the law was... I'll give you just five more minutes. I do want you to, not so much, and my colleagues might correct me, but speak only in person if you're not as interested in your Fourth Amendment argument as I am the policy. Okay. Excuse me, the Fourth Amendment. At least I'll have a number of questions for your colleagues. Your colleague, the Fourth Amendment. I've got a lot of concern about what happened. There was the district court's disposition of the Fourth Amendment claim. But the policy, how do you get liability here against the borough? You rely upon some cases, one out of Allentown, one involving Allentown, one involving Philadelphia, both of which are cities and under Pennsylvania's law. You've got a borough here that's different than a city of the first class. I don't know what Allentown is. Second class city? I don't know what it is. But why would a police chief, what evidence is there in the record, that the police chief could be viewed as a policymaker? Well, the police chief said in his deposition he was responsible for the creation of these policies. We rely upon the training that was given to the police officer himself, the testimony of the police chief as to what that training consisted of. So there's no training as to the application of the Wiretap Act, but you're not arguing that police have to be trained in every subsection of prudent statutes in order to avoid municipal liability? No, Your Honor, that's not my argument necessarily. However, I think you need to look at the overall facts of this situation. You have an individual whose conduct involves videotaping the police officer in the performance of his duty. I don't think there's any way a reasonable police officer could conclude that that conduct is criminal. But focus on the policy and customs. That's the police chief. That's not Officer Rogers. And the police chief says that that arrest was legitimate. He supported Officer Rogers' actions after the fact. He did, Your Honor. Does the ratification of the one act after the fact create a policy that was in place before the ratification occurred? I don't believe. Well, I think the case law is clear that it does not normally create a policy. However, in this particular case you did have statements to the media, and you had statements afterwards saying that what the officer did was policy. That seemed like a policy of trying to stave off liability. That's the sense I got from the record. I see where you're getting at. Yeah, exactly. Well, regardless of the reason for the policy, I think when you have the police chief saying that this was what was done and this is appropriate and this is how we want things to be done. Did he say that? Pardon? This is how we want things to be done? Did he say that? I don't know that he actually used those words, but he certainly said there was nothing wrong. They were more opaque about it, weren't they? Well, we still think there was nothing contrary to the law or nothing that would subject us to liability. They seemed to be classic lawyer-driven statements to try to avoid liability, weren't they? I don't know if they spoke to a lawyer about avoiding liability. That may well have been the intent, but the question is – But then your client had got on the news by then. I mean, this would become a cause to lead at that point, had it not. It received significant media coverage by that point. Probably the biggest thing since Jim Thorpe's passing. Pardon? Probably the biggest thing in Carlisle since Jim Thorpe's passing. Well, I think there's other big things that have happened there, but this was certainly significant in that community. What we would rely on for the – we don't, to be perfectly honest with the court, we don't have a written policy beforehand directing the police to make these sorts of arrests. In terms of policy, we have merely the police chief saying that this is the way it's supposed to be done. At least that's how I interpret the police officer's statements, and I think that's how – a fair interpretation of them. And it's important to you to establish a Monell liability. Why? Because it circumvents any risk of finding qualified immunity for Officer Rogers, or is there some independent reason? Well, the concern is really more of a – our concern goes further than just Officer Rogers. When you have the police chief saying that it's okay to arrest protesters who are videotaping police, I think that we need an injunction or something. You're sort of wrapping the hat there. Pardon? When you get into the protester scenario, one, I'm not sure that the record would support that, and I'm not sure you actually said that. So there are two problems. One, that's not what the police chief said, and two, that's not what the client was doing. That's correct, Your Honor. I was asking the question as to why I thought Monell liability was important. And in this case, we do – our firm does do a lot of protester cases, and video recordings of the police are frequently an issue. When you have the police chief saying that it's okay to arrest somebody for videotaping a police officer and the performance of his duty, I think the municipal liability becomes very important and it's necessary at that point in time to get that action enjoined or at least declared unconstitutional. Do you really have a jail situation where you're protesting and the protester is videotaping that? I guess that's an issue for us to wrestle with, just how analogous is that to what we have here. Okay. But thank you very much. We understand your argument. We'll hear back from you on rebuttal, I think. Okay, thank you. Good morning, Your Honors. Nancy Winkleman for the ACLU as amicus. And let me start by thanking the court for permitting us to have a few minutes of appellant's time. Let me ask this. Do you really, as informed and knowledgeable as you are in having clerked for one of the very fine judges on this court, do you really want us to say that district court judges must spin their wheels writing or planning about an issue that is really irrelevant to the ultimate disposition of the case? What the ACLU's primary interest in this appeal is that this court give guidance to the district courts in terms of how to exercise the sequencing discretion post-Pearson. The concern of the ACLU, our concern, is that after Pearson, district courts too often will go straight to the clearly established or not clearly established prong of the qualified immunity test. But doesn't Pearson say they can? Absolutely they can. And we certainly understand that the mandatory sequencing rule of Saussure is now, that hard and fast rule is no longer. But the concern of the ACLU is if district courts too often go immediately to the clearly established prong, it will impede the development of excuse. I'm not clear whether the ACLU position is that it was error for the district court to proceed as it did and this court should so determine or simply that you'd like this court to say in a footnote or a paragraph, gee, it would be nice if some district courts didn't handle things that way or what? I understand the concern, Judge Pollack, because we certainly recognize that this is now a matter of discretion for the district courts. But the discretion shouldn't be unfettered. And this court can give guidance, and I'd say particularly in First Amendment cases and particularly in a case like this where you're talking about videotaping police officers and the performance of their duties and the complex First Amendment issues as your dialogue with appellant's counsel showed. Particularly in those cases, it's important that district courts struggle with, was there a constitutional violation? Otherwise, we'll never have the development of constitutional law, which is certainly Justice Alito and Pearson recognized that constitutional stagnation is a concern and that it's appropriate and often beneficial for courts to reach that first issue first. And in this case where there's important and recurring First Amendment issue, especially given technology today with cell phones and how easy it is to videotape, it's important that the Court of Appeals give guidance and say what we would ask is that departing from the typical order should be the exception, not the rule. I mean, certainly not the rule. We know that. But it should be the exception, particularly in First Amendment cases. The person's entire purpose was to broaden the discretion and associate analysis, wasn't it? Absolutely. She wanted to narrow what Pearson was trying to broaden. Actually, I put it another way, Judge McKee. You didn't have to. No. I see that. I see that. Not to narrow it, but to give district courts some guidance. Prior to Saucier's hard and fast rule, this court gave, it was the land of discretion, and district courts could approach this as they wanted. And this court certainly was willing to give guidance and did give guidance to the district courts and say here are the types of cases where it probably makes sense to go to the clearly established prong first, where there's highly unusual facts, where it's not a recurring fact pattern, where there's a circuit split. Let me understand what you would like this court to do. Let's assume for the moment that this court were to conclude that there was not an established, a clearly established right of the kind that you contend for. Assume that. That's not an assumption that you're eager to reach, but take it for a moment. Would it be your position that it would be a good thing for this court to write an opinion which says we're persuaded by the ACLU and also by Mr. Boyle that Mr. Kelly was exercising a First Amendment right in videotaping point one. Point two, however, we don't think it was a clearly established. Maybe it now is, but it wasn't up until the Kelly-Rogers confrontation. The first part of the opinion then would be, would it be dicta or would it be an exercise by this court if it's First Amendment right to talk about the law? I think this is just the point, Judge Pollack. If this court, the district, does what the district court did and go immediately to the clearly established, we'll never know. We'll never know, or it will be difficult to know whether in fact there is a First Amendment right to videotape, and the law will never be clearly established. And that's the conundrum. And that's why even after Pearson, where certainly courts have discretion, we understand that. In First Amendment cases where there's a recurring fact pattern that's going to come before the courts over and over again, it's particularly important for the courts to address the first question of the constitutional violation before they get to the clearly established point. Otherwise, it will never be clearly established or established at all. But that would be inconsistent with the canon, as mentioned in Pearson, of avoiding constitutional adjudication when it's not necessary to get into a constitutional issue. That's been the canon for a long time. They mentioned in Pearson that was one of the concerns that caused them to cut back on the saussure. Absolutely, but Pearson also recognizes the countervailing concern of constitutional stagnation. If the courts always go or generally go to the second prong of the test. And the Pearson court balances both those competing concerns. I beg your pardon. I'm sorry to interrupt, Ms. Winkelman. You speak of this as a problem that's going to recur again and again. But it's not always going to recur again and again in this scenario that's presented here. Won't it be presented in a whole lot of scenarios in which the First Amendment issue will be different? Won't it be right there? The issue is not one of clearly established and qualified immunity and whatnot, but the efforts of some protesting group to videotape police activity and the police ordering them to leave. I don't know, a variety of scenes. Asking for a permit and having it denied. Don't you get First Amendment issues not cluttered up with whether it's just clearly established? I'm asking whether this First Amendment issue isn't one that's going to be arising and then resolved by this court or other courts in other contexts. The ACLU brief cites a law review article that talks about the proliferation of cell phone and videotaping because of that. I understand that every case is going to present a different fact pattern, but that doesn't mean that the contours of the First Amendment right to videotape police officers in the performance of their public duty shouldn't be addressed by the courts. That's really what the ACLU asks this court to do. There's also a law review article that refers to our focusing more on the first front when the case can be decided on the second front. Judge LaValle referred to that as a puzzling misadventure and constitutional victim and no lesser entity than the New York University Law Review. Why wouldn't it be? Going back to Judge Pollack's question, why wouldn't it be pure dicta? If we get into a situation where we say, well, there clearly was not a reasonably established right at the time. Let's look at the right, however, and define that right. Everything we say defining that right, if we say that it wasn't clearly established at the time, why wouldn't all of that be dicta and therefore really not add to the body of the development of the right that you're trying to get us to do? Well, then it would always be dicta. Then there would never be a case in which the contours of the right would be, I mean, even if it's dicta because it doesn't matter to the holding. But it's never dicta when the district court does it because the district court always has the opportunity to address both questions, right? That's correct. Thank you. That's a better answer. Well, I don't know if that helps you with us, though. We're not the district court. I think the difficulty you face, speaking only for myself, is that Pearson, much like the Supreme Court has done in the sentencing area, has said, trust district judges, let them do their jobs. And, you know, unfortunately, I think for your position, when the district court opts exercise its discretion to go to step two, it sort of leaves you in the lurch. But there will, I hope, be several cases where the district courts, in their discretion, will choose to address both questions, and then it won't be dicta for us to address both questions. What wouldn't be dicta, and just stepping back a step away from even there, is for this court to say, even post-Pearson, in First Amendment cases, because of the heightened protection that the courts have always given to the First Amendment, and we've discussed that in our brief, and the court is familiar with it, departing from the typical sequencing should be the exception. It wouldn't be dicta for this court to say that, and that would then prompt the district courts to do, Judge Hardiman, just what you suggest, which is to go through the sequencing step, you know, first asking whether there's a violation of a constitutional right, and then asking whether it was clearly established. It's the discretion of the judge to decide whether or not, in a given case, the facts and the law are such that it's important, in that case, to opine on whether or not there's a constitutional violation, and then, if there was, whether or not it was clearly established, and let the individual judge call that shot as he or she sees it. But this court, prior to Saussure, that put this kind of mandatory sequencing into place, guided the district courts in how to exercise that discretion of which prong to go to first. And, really, we're asking, just because Pearson says that it's now a matter of discretion, well, it was a matter of discretion prior to Saussure, and this court gave district courts some guidance to make sure that these questions were addressed in the district courts. We're suggesting that there's nothing in Pearson at all that would prevent this court now from saying, okay, post-Pearson, here are the considerations at play, too. Is this a recurring fact pattern? You may agree or disagree, but that's a factor to consider. Is this highly unusual fact, such that a ruling would never really promote the development of constitutional law? Is there a circuit split? Pearson doesn't say always in discretion. Pearson doesn't prohibit this court from doing what it does in many areas, including qualified immunity, and that is giving the district courts some guidance as to how to exercise discretion that the Supreme Court has given it. Would you reckon it would be the same if we were to decide that there was no First Amendment right? I mean, you're kind of assuming that our foray into the two-step analysis is going to flush out more of the constitutional rights that a person has. What if it does the opposite and we start deciding these cases in a way that starts taking away First Amendment liberties or Fourth Amendment liberties? Would your response be the same? Well, I'm not sure. It should happen. We could decide, yeah, there's no right here. I certainly see and appreciate the concern, but I think that the interest in considering constitutional violations and constitutional rights, however it turns out, is more important than the outcome of any one particular case. I think the problem is it's easy often to go to the clearly established prong because the right may be uncertain, the right may be unclear, the right may not be well-defined. It may be hard, as in this case with the First Amendment right. But if you always go there, then there's never going to be a First Amendment right or even understanding for the officer and for the plaintiff whether there is a First Amendment right to videotape if you're always just going to the second part of the analysis. Well, is it really that gloomy? You've urged this panel to give advice, rather strong advice, to district courts as to how to proceed. You've probably noticed that district judges are fairly intractable, hard to persuade. If in this case, for instance, and other cases that present the same scenario, the district judge proceeding in a way that you think is not the optimal way, don't you get where you want to go by persuading this panel that there was a First Amendment right here and getting the court to say that, whatever the court goes on to say about whether it's clearly established. I could imagine, for example, a court of appeals saying, we can't tell what's clearly established unless we define what the First Amendment right is. And so we'll start out doing that and either find or not find a First Amendment right. Well, certainly, we argue in our brief, and I didn't have a lot of time here, so I was trying to focus on the order, the sequencing, that issue. But certainly, if the outcome of this case were to find that there was, in fact, a First Amendment, there is a First Amendment right to videotape police officers in the performance of their duties, that would give guidance to district courts about the contours of that constitutional right, which would be a very good outcome. Just on that issue. Same thing if we said there's no constitutional right. It has much guidance, and there is no constitutional right to videotape. We can rely upon MIMS in a lot of cases that Judge Hardiman was referring to. And of course, there's no constitutional right to videotape officers in the context of a traffic stop, a vehicular traffic stop. We'd be happy with that. Just going to that point, Judge McKee, and picking up on some of the questions that the panel was addressing to Appellant's Counsel, to Mr. Boyle, if this court were to hold that Mr. Kelly had a First Amendment right to videotape what the officer was doing in this case, it would not mean that in every case, no matter what, whether the person's hands were on the dashboard, whether the person was outside of the car, and where nothing was going on, that there was a blanket First Amendment right to videotape. This can be more narrowly defined in this case, because actually he wasn't asked to put his hands anywhere. He wasn't out of the car. He did have the opportunity to videotape. But even more importantly, I think, for First Amendment purposes, something prompted him to start his cell phone rolling. Something prompted him to start the videotaping, and that was some yelling, some altercation, some unprofessional, in his view, conduct on the part of the officer. And so certainly this court, with respect to the substantive First Amendment issue, could hold that while traffic stops may be different from protester cases, may be different from the Robinson, from Judge Bartle's case with the trucks, that where there is some reason that the plaintiff suspects that there could be a problem with the police activity, I mean, think of Rodney King, not to be inflammatory, but we don't want to curtail citizens from recording police activity if there is, and this would be the limiting principle, if there is some reason to think that something might go awry. This is a good thing for society. It's a good thing for the plaintiffs. It's a good thing for the police. So that would be on the substantive First Amendment issue where the lines could be narrowed. Thank you very much. Thank you so much for the time. Very much appreciate it. The employees of the court, my name is David McMain. I represent the appellee defendant, Officer David Rogers, in the Borough of Carlisle Police Department. Runners, this is a case which was decided on qualified immunity, which, in my view, this is a case which is exactly what qualified immunity was designed for. We have a police officer who does what we expect and prefer officers to do if they can, and that is seek legal guidance from the on-call assistant to a sick attorney, who certainly has reached... He almost seized the camera before he sought legal guidance. Do you want police to do that? Well, he seized the camera... Conduct a seizure and then determine whether or not it's legal? Well, he immediately calls the ADA. It's not a situation like we may have in other cases where the person is arrested, charged, and then after the fact legal guidance is sought. He seeks legal guidance as he's expected to under the policy of Carlisle, and frankly as Pennsylvania law requires in the wiretap section as it pertains to police officers and their recording of individuals through their in-court camera. Until we know for a fact, as it conceded, whether or not Officer Rogers told the ADA that he, Officer Rogers, was recording the traffic stop himself. I do not believe that was on the record, whether he did or he did not. Wouldn't that be important to an issue of qualified immunity, though? Well, I don't think it would, Your Honor, because what the ADA says when he's deposed is that was not material to his analysis. He looked at... Well, how could it not be material? What expectation of privacy would it be if there's a videotape camera rolling 10 feet away? How could that not be material? The distinction is the officer's videocamera is only picking up picture. In order for the officer to activate the sound, he's required under Pennsylvania statute, which came into effect fairly recently with the advent of in-car cruisers, in order to have sound, he must first indicate and warn the person that they are being videotaped. It's the same analysis or the same requirement in police holding cells. They're not required... You're saying that the Fourth Amendment only kicks in on visual images but on audio recording? Well, that's what the officer understands, and that's where we get to the qualified immunity. What would a reasonable officer believe? The officer is trained that he is not permitted under Pennsylvania law to record sound unless he first informs the person that they're being recorded. Officers are also trained that they cannot use sound in the holding cell unless there's been some notice to the person, either through a sign or through visual warning. And so as the officer is trying to exercise his good faith discretion, he knows that I'm required to do this. Officer Rogers testifies this. I'm required if I'm going to take sound. He believed the citizen was held to the same standard to which he is held under state law. Correct. And he was wrong. And the ADA was wrong. Right? I do not think that the ADA was wrong. Henlon and Agnew couldn't be clearer. If you don't have a reasonable expectation not to be surreptitiously recorded during an interrogation in an interrogation room, how does an officer have a reasonable expectation not to be surreptitiously recorded when on a public street during a traffic stop? This is in the context of a traffic stop. Traffic stop is more private than an interrogation room? Your Honor, I believe that both with Henlon and the other cases that are cited by plaintiff, it's a different scenario in that the officer now, as I said before, is required under the statute, the videotape statute, that officers are expected to follow to give fair warning to an individual before they record sound. But as I just said, state law holds the officers to a higher standard than the citizens. Citizens are not required to give that disclaimer or that disclosure the way that officers are required to do under state law. But for the qualified immunity analysis, Your Honor, the officer has some reasonable expectation that the standards to which he is expected to follow should apply equally to the citizen. But police are held to higher standards than citizens all the time. I mean, why would a reasonable officer expect the citizenry to be held to the same standard as they are when in a whole variety of ways the law enforcement officers are held to a higher standard? Which is exactly why the officer believed that it was prudent, and in fact something that officers should perhaps do more often, is call for legal guidance from the on-call ADA, certainly. No, but that was good that he called the ADA, but the ADA got it dead wrong. The ADA gave him awful legal advice. The ADA looked at the first part of the statute and didn't look at the definition of oral communication, right? Well, which is exactly the plain reading of the statute. It would appear that there was a violation. The officer consults with the ADA, whether with the benefit of time and analysis, the ADA was wrong. He needed another 30 seconds to look up the definition of oral communication. The statute uses the phrase oral communication. That phrase is a defined term under a different section, I think, right next to it. It's an extra – he forgot to take – the ADA forgot to take the extra 20 or 30 seconds to look at the definition of oral communication, which requires an expectation of privacy, of reasonable expectation of privacy, right? Which may very well be the case, but the issue as the officer, is it reasonable for him to rely upon the on-call ADA, who clearly has the benefit of more legal training, more – All right, so that's where I wanted you to go. The crux of your argument is assume that the legal advice was faulty. It was still reasonable for the officer to rely upon. That's correct, and I think – Then how do you get around the cases where an officer swears on an affidavit of probable cause and doesn't go to a lawyer but goes to a judge, and the judge issues a warrant, the Malley v. Briggs situation. How do you get around that line of cases? Well, I think those line of cases require, in order for the officer not to be immunized from liability, one of two things had to have occurred. Either there was false information. If the officer knowingly gives false information to, in this case, the ADA – False or incomplete? Would you define incomplete as false? No, I think the second part is either false information or reckless disregard for the truth. So, for example, if a case where an officer – one particular example had a lineup of six photos indicating in his affidavit that the victim picked out the suspect out of the six photos but failed to mention that they kept the name of the police department where the photos were taken and only one came from an outside department, the officer told the victim, we found the guy that did it, he was arrested in X municipality and there's only one photograph. That would be an example of reckless disregard for the truth. We don't have – Mr. McMahon, let's assume a different scenario. Let's assume that this was a lawsuit in which the defendant, or at least one of the defendants, was the assistant district attorney who gave this sage advice. Would that – you wouldn't say that the assistant district attorney was entitled to qualified immunity for this kind of advice, would you? Well, I think certainly prosecutors are entitled to even greater immunity than police officers. Greater immunity? I believe there's absolute prosecutorial immunity in some scenarios and therefore there's actually greater protection if the prosecutor had been named as a defendant than the police officer. Just like the magistrate who issues a bad warrant is entitled to judicial immunity. Correct. But the police officer is the guy left holding the bag. When the judge screws up and issues the bad warrant, when the ADA screws up and gives the bad legal advice, the poor police officer who's neither a lawyer nor an expert in the law, he's the one holding the bag. That seems to be what the Supreme Court tells us. And that's the unfortunate part. I served as a Pennsylvania State Trooper before I went to law school. While I received legal training, I know much more about the law now than I did then and I can make wiser decisions, but we expect police officers to make decisions on fairly sophisticated legal issues that we've been debating this morning. We've briefed for months and months and the judge came, will we expect the police officer on the street to get it absolutely right? And if they don't... The Fourth Amendment is pretty clear. Any seizure basically, absent a warrant, is unreasonable. Absent certain actions and circumstances which don't seem to exist here. And here you've got a seizure. He knew he didn't have a warrant to seize the camera. Why wouldn't that in and of itself tell Officer Rogers that what he just did was unreasonable? He seized someone's personal property without a warrant. Are you referring, Your Honor, to the time period when he initially seizes the camera and calls... At the time of the seizure, he knew he didn't have a warrant. He's not arguing any kind of actions and circumstances. He didn't think there was some kind of a bomb or anything in that camera when he took it. He just took it to stop the camera from videotaping. He knew he didn't have a warrant. Why isn't that enough to get past qualified immunity? He knew that was unreasonable. Officers are permitted for a temporary short-lived detention, which is what that period of time, say two, three, four minutes from the time he confiscates the camera, until he calls the ADA. The officer testified that, I believe I have a wiretap issue. I'm not certain, though. I'm not a lawyer. I'm not an expert in this area of law, and so I'm going to call and get guidance. If the ADA had told him, absolutely not. There's no violation here. He returns the camera and no charges are filed. Instead, we have just the opposite happens. The ADA provides him with the body. Why isn't that like seizing the piece of property and then filing for the warrant? It's a temporary seizure while he gathers the information and gets the consultation, which we would prefer officers to do if the scenario permits. It's like when you grab a gun and you hold it and then you call and you do a check and it turns out to be a legal weapon and you give it back to the guy. Or during a Terry stop, you might take him out of the car and cuff him briefly, and then there's no problem. You put him back. A Supreme Court has said that's not a seizure. I would say it's a temporary. Why is that not a seizure? In the MIMS situation in Ontario, why is that not a seizure? Because I think officers are permitted a period of temporary detention. I think the Terry example is... Why? Why? Well, we afford officers some discretion, much like we're talking about the discretion with the district court. But why? Why? Why do we do that? Because of the time frame and the scenario the officers are working under. Well, we don't allow them the authority because of the time frame. We allow them the authority as a matter of fact of necessity to protect themselves. You don't want them to have to leave a gun on the street. So you allow them to take the gun. You allow in a Terry stop a temporary detention for a temporary very limited pat-down to make sure that there are no weapons on the person. But again, there's nothing here to suggest that he thought that camera was going to go off in a few seconds. There was a bomb with it. It concealed the gun. It's not that kind of scenario, really. No one is suggesting that those, if you will, exigent circumstances justify the seizure. By analogy, though, Your Honor, I don't think it's any different in the temporary period of time while the car stopped, while he's writing the citation to the driver, gathering information, checking for warrants, and doing the other type of things that take place... But that's just the uniqueness of a vehicular stop. Does that mean that anything in the vehicle, even if it doesn't pose any threat to the officer, can be seized without a warrant? Because that's exactly contrary to the law. The law still requires a warrant for what's in it. It's a separate closed container in the trunk. You can't just go into the trunk because you've got to stop the vehicle. I think kind of the template really is reasonableness. And the reasonableness of confiscating a camera for a short period of time while he seeks legal guidance is not unreasonable. That's not your problem here, though. I mean, the problem here is that Kelly was taken into custody and the camera was seized completely. I mean, there was nothing preventing this officer from getting Kelly's name and going back to the station house and investigating more deeply whether the wiretap act was violated and then swearing out a criminal complaint. Kelly could have easily been prosecuted in due course for that crime if he had committed a crime. Kelly himself as a person was not seized until after the officer had gotten approval from the on-call assistant district attorney. He was not seized, arrested, and taken into custody until after. No, but my point is there's sort of an argument you made earlier of heat of battle. ADA had to look this up. There's nothing preventing the ADA from saying, you know, I read the statute and it looks like you have cause here, but I need to do a little more digging. Get the information and we'll talk about it later. I mean, that's the point here. This kid didn't need to spend the night in jail. Even if his behavior were not that of an ideal citizen under the facts of this case, he didn't have to spend the night in jail. In fact, your officer didn't want him to. The judge sort of threw you a curveball by locking the kid up, right? Right, and I suppose, Your Honor, if the factual scenario was the ADA said, geez, I'm really not sure, don't take him into custody, let me do more research, let me consult with other people, then we'd have a different scenario. But the advice the officer is given is that there is a violation, charges ought to be filed, and the ADA also, much like the officer, also recommended ROR. And so while I would agree that that was an unfortunate consequence, again, we're faulting the officer. But isn't it the law, though? Doesn't the Supreme Court tell us that the officer on the street, the one with the toughest job, the least amount of legal training, and probably the least financial remuneration is the one who's on the hook when an ADA gives faulty legal advice or when a judge grants a bad warrant? Unfortunately, yes, but that's why the Doctrine of Qualified Immunity is in existence, to protect officers from reasonable arguments. But they can't hide behind the mistake of the magistrate that issues the bad warrant, or in this case, the ADA that gives bad legal advice. Can you cite a case where they can hide behind that bad advice? Well, that would be the line of cases we spoke about before, Malik. The officer is immunized absent extreme circumstances like false information. False information, let's focus on, this is summary judgment. And it may well be, it seems to me, that a jury could conclude that the officer intentionally did not give the ADA all of the information that the ADA would have needed to give an accurate answer about that scenario. It did not tell him, apparently, or at least it's disputed, whether or not he mentioned that he himself was videotaping, which may turn out to be an important fact. I don't know. But whether or not the officer had a reasonable expectation of privacy in the interaction that he was having with Kelly. To me, it seems like that's not something that on this record can be decided, as well as whether or not in his motivation in calling the ADA. The plaintiff argues that he called the ADA not for advice, but for approval, basically a ratification of what he had already done. And on this record, you could support that argument. How on summary judgment can we find qualified immunity? I think you'd take even the facts that aren't in dispute. That it was approved. He lied most favorable to the plaintiff and as he's pled. Well, except that both parties moved for summary judgment. So we really have an unusual scenario where we don't have just taking one side. Good point. Mr. McMahon, you're arguing this case properly on the scenario that exists, that Officer Rogers called the assistant district attorney and got advice, which might be regarded as bad advice. And you said that the assistant district attorney is closed with more immunity than the officer, which is certainly a valid point. Suppose we eliminate the assistant district attorney from this scenario. We were just talking about a decision by Officer Rogers to arrest Mr. Kelly, saying, you know, Mr. Kelly, you've just violated the oral interception law and that's a third degree felony in this commonwealth and you'll come along with me, please. Putting in balance not merely the text of the statute, but the text of the First Amendment, do you think by any chance Officer Rogers could be protected on that basis under a plea of qualified immunity? Had he not sought and obtained legal counsel? He had not sought any legal advice, but he had clearly had in mind, indeed he'd memorized perhaps, at least a part of the statute, the oral interception statute, that Mr. Kelly, you've just violated an important law and you're going to be arrested. You've said, Mr. McLean, that you were a police officer yourself before being a lawyer. Doesn't it surpass your sense of what a reasonable police officer would do to make an arrest under those circumstances all on his own? I don't know, Your Honor. I think that it's, when we go to the second and really kind of the third quasi-part of qualified immunity, that is was it clearly established or would an officer have a reasonable belief that probable cause existed, I still think there would be afforded qualified immunity to the officer. Now, certainly it's a very different scenario than what we have here. We have the Assistant District Attorney saying that… See, as I understand the plaintiff's case, maybe I'm putting into it more than it's meant to be there. It seems to me part of the suggestion is that Officer Rogers called the Assistant District Attorney to get the protective covering of, oh, well, I had a conversation with a prosecutor and he said, sure, go ahead. And that was not a really seriously intended, I want advice on this. I don't know how we can tell, except that summary judgment may not be the right place to stop the inquiry. Yeah, I don't know if plaintiff is asserting that the officer did this merely as a rubber stamp. I don't think there's any evidence whatsoever of that, and I don't think that that is really an explicit argument made by plaintiffs. Well, he's saying approval on that advice, which I think he's saying he did this to cover himself. But a jury could clearly conclude that on this record, it seems to me, that one, the officer did not tell the ADA everything the ADA needed to know to make an intelligent decision, and there was a reason he didn't tell them everything, and that was because he wanted to show this guy who was boss. I want to teach you guys, as was said earlier on, when you guys are going to learn you can't videotape this. That was allegedly said by another officer, not by Officer Kelly. I understand. I think there has to be some evidence of that, that there was a malicious intent and there was some kind of inappropriate. The officer went over to the ADA, told the ADA certain things but not everything that the ADA needed to know to make a decision under the Wiretap Act. What he did not tell him, perhaps, was the difference between whether or not the arrest and the seizure were with probable cause and legal versus without probable cause and illegal. The jury could conclude that he had a reason for doing that, that he was going to teach this guy a lesson. That's not at all a Herculean stretch of the imagination. What we also have there, Your Honor, in addition to the ADA that day, is the District Attorney, Mr. Freed, who issues the report that says, even looking at all this, after the fact, and looking at one of the possible defenses to this, if the officer didn't have a reasonable expectation of privacy, the DA himself still felt as though there was probable cause for the charges to be filed. Now, Judge Harlan, they said… Either he didn't read the definition or he was just trying to be a good fiscal servant and protect his borough from liability. I mean, what else can we make of this? When the case is over, you should send him your notes from Constitutional Criminal Procedure. This is the County District Attorney, so I don't know if he would have any impetus to try to protect the borough of Carlisle, but I go back to the whole purpose of… Go back to the officer. The whole purpose of qualified immunity is a scenario such as this, that we expect tremendous amounts of responsibility placed on police officers. What we're asking in this case is for a police officer to be a constitutional scholar and to not only divine constitutional analysis on the scene at the time, but to also say that the on-call assistant district attorney who said there's a violation was wrong. And even the district attorney who had weeks to research and analyze this, he also was wrong. And in addition, asking essentially that a district court, Judge Cain, didn't weigh in on the issue as well. And to me, it's exactly what qualified immunity is intended to do, to protect officers from reasonable, even if they're wrong, from reasonable good faith mistakes. This is the case… When you say good faith, that complicates it dramatically. No, it's not subjective. It's not subjective. It's an objective test. It is, but then we have the neutral assistant district attorney. Well, he's not neutral. The ADA… Even if we assume everything Officer Rogers did here was by the book, I mean, you know, he's still stuck if the ADA gave him bad advice under the law. He may be stuck for issue number one, and that is was there a constitutional violation. But I think that issues two and really kind of the quasi-third issue that has been woven in through case law is where the case and where the qualified immunity protection comes into play. And that's exactly, I believe, why Judge Cain ruled on that second and third issue because it's simpler. You don't get in these complicated constitutional issues, which Pearson… That's exactly why Ms. Winkleman is making her argument. The judges are too inclined to take the easy way out. I mean, First Amendment, you can argue it wasn't clearly established, but Henlon and Agnew are decisions of the Pennsylvania Supreme Court that were extant for decades. They're clearly established law. So the issue is… I mean, I'm saying the Fourth Amendment. It's different than the First. The First, you've got our court saying there may be a right. You've got a district court here, a Ninth Circuit case there. That's quite a different scenario than the wiretap issue for the purposes of the Fourth Amendment. You've got two Pennsylvania Supreme Court cases directly on point. So I guess then the issue, one of the issues that is being asked to be weighed in on is essentially taking Pearson, which says give discretion to the district courts and taking that discretion away unless the year after Pearson is decided. I think that it would be inappropriate to essentially ask extra work of the district court. I think what Pearson was intended to do is give some discretion to the district courts to look at the issue, which is… But did she even analyze that? I don't recall her opinion. Did she cite Henlon and Agnew in her opinion? I don't think she addressed that threshold issue of whether there was a constitutional violation. Rather, she, not going through the mandatory sequencing, which is what Pearson allows, addressed issues two and three in the course of the review. When you say two, you're talking about clearly established. Clearly established and… A trial judge can't analyze whether something's clearly established until you look at the case law, right? I mean, Henlon and Agnew are the cases that a trial judge ought to look to to see whether there's a clearly established right. I'm not sure necessarily you would have to look at the first issue. When I say issue number three, what I'm referring to is under the Carswell case and other cases this circuit's decided, there's this closely related issue of whether the officer made a reasonable mistake as to what the law requires. Is that the extraordinary circumstances argument? I don't think it's extraordinary circumstances. I'm not sure of that. I mean, you could argue under Harlow that, well, even though there was a clearly established law, there was a constitutional right and it was clearly established, we have extraordinary circumstances here. But I didn't understand your brief to be making that argument. Well, you're arguing good faith, which does slide into the Harlow extraordinary circumstances. Right. Paul, I've got a question. Mr. McMahon, you stressed that Officer Rogers was probably not a trained constitutional scholar and that qualified immunity is one of the devices that's important to protect an officer in the conscientious, if mistaken, conduct of his duties. He not being a constitutional scholar, wouldn't it be of value to him and to his colleagues on the force to be advised by this court, as Ms. Winkelmann has asked some court to do, to be advised whether there is a First Amendment right to be doing what Mr. Kelly was doing? You would welcome, in short, I'm wondering whether you would welcome some pronouncement from this court. I think police officers always welcome some absolute black and white rules on how they're supposed to do their job. The difficulty is oftentimes, and it's kind of what we lawyers do, we can take the same case or cases and argue that it says different things and leave officers to try to divine which is the stronger, better argument. I think that police officers would always welcome some absolute clear guidance on certain... so they know what the rules are. Too often the case, the rules aren't always clear to police officers. I guess in specific response to your question whether or not Officer Rogers would like clarification on whether in the first instance there was a constitutional violation, I don't know. I can tell you that it is often difficult on the street to make a decision on difficult issues that we lawyers wrestle with. And so I almost think by asking this court or the district court the rule on issue number one would be helpful, but I also think it would be contrary to what the Supreme Court told us less than a year ago in Pearson, that is, there's some danger in weighing in on issues if it's a very fact-specific and case-specific. I don't know if I've answered your question. I don't think I probably have, but it's kind of a mixed... much like when the question was posed of Attorney Winkelman, there's kind of a mixed answer to whether or not question one should be answered. Suppose a scenario had arisen in the Eastern District of Pennsylvania, not the Western District. In the Eastern District, the chief judge of the district court has said there is a First Amendment right to photograph, videotape officers and the performance of their duty. Would that mean that in the Eastern District there was a clearly established right and no... I think it would be closer. I'm not sure I'd agree because I think the facts of that case, again, the distinctions which make this case somewhat unique is the sound, which is what the rules the officers are bound to follow in the course of their duties. The sound and the surreptitious portion are slightly different from the case that Judge Bartle decided from the Eastern District. I would concede I think it's closer since there's no guidance in the Middle District on this issue, but I don't think that would necessarily make it clearly established if we're in the Eastern District instead of the Middle. But I do concede it would probably be closer. Mr. McMain, thank you. Thank you, Ernest. I'm going to leave Mr. Boer reserved a few minutes for rebuttal. May it please the court, just with respect to the qualified immunity, there are several points that I would like to make at this point in time. First of all, in order for qualified immunity to exist, the officer's conduct has to be objectively reasonable. In this particular case, we would submit that the evidence shows this was not objectively reasonable. The officer arrested under a statute that he was familiar with and that he claimed to be familiar with. He never took the time to read the definitional section of the statute. Pennsylvania Supreme Court cases...  You wouldn't invite the officer to sit down and download the statute, would you? I guess you could now with the technology. Well, it's in the same criminal procedure book that the officer had with him. I think the officer's charged with knowing what the elements of the offense are and what kind of communication is covered when he's talking about an arrest under the Wiretap Act. Also, we have Supreme Court cases that are decades old that say there has to be a reasonable expectation of privacy. There's simply no way that Officer Rogers could have thought that he had a reasonable expectation of privacy. This happened on broad daylight, on a public street, while he was in the performance of his public duties. So there's no way that a reasonable person could have concluded that this statute applied. Secondly, with respect to the call to the Assistant District Attorney, there are three factual disputes with respect to that matter that I think are significant. Number one is the fact that the officer reported that the recording was surreptitious, and Brian Kelly and the driver of the vehicle both deny that. They both indicate that the recording was open. Secondly... The officer didn't see it the first time around. He saw it a little bit in the middle of things. That's undisputed. Well, I don't think it was turned on at the beginning. I don't think it was turned on until halfway through the transaction. But does any of that matter? I mean, if the ADA gave bad advice, isn't that game set and match from your perspective? Well, I think it is, to be perfectly honest, because it was completely unreasonable advice. However, I think that a district attorney is quantitatively different from a neutral magistrate to begin with, and therefore, reliance on the district attorney should be very circumscribed. And if you are going to rely upon a magistrate, then the information you give to the magistrate has to be accurate and complete, and it was not in this case. Thank you very much. It's been very interesting, and actually a very important case from a number of perspectives. So taking that under advisement, thank you, all of you, for a helpful argument and briefing. We'll take about a five-minute break before the next case.